# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| WILLIAM T. KELLEY, | : | |
|---|---|---|
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civ. No. 10-323-LPS |
| | : | |
| MICHAEL J. ASTRUE, | : | |
| Commissioner of Social Security, | : | |
| | : | |
| Defendant. | : | |
| | : | |

Angela Pinto Ross, Esquire, of DOROSHOW, PASQUALE, KRAWITZ, SIEGEL & BHAYA, Wilmington, Delaware.

Attorney for Plaintiff.

Charles M. Oberly, III, Esquire, United States Attorney, Dina White Griffin, Esquire, Special United States Attorney, and Patricia A. Stewart, Esquire, Special Assistant United States Attorney, of the OFFICE OF THE UNITED STATES ATTORNEY, Wilmington, Delaware. Of Counsel: Eric P. Kressman, Esquire, Regional Chief Counsel and Shawn C. Carver, Esquire, Assistant Regional Counsel, of the SOCIAL SECURITY ADMINISTRATION, Philadelphia, Pennsylvania.

Attorneys for Defendant.

## MEMORANDUM OPINION

December 16, 2011
Wilmington, Delaware

**STARK, U.S. District Judge:**

## I.   INTRODUCTION

Plaintiff, William T. Kelley ("Kelley" or "Plaintiff"), appeals from a decision of

Defendant, Michael J. Astrue, the Commissioner of Social Security ("Commissioner" or

"Defendant"), denying his application for disability insurance benefits ("DIB") and supplemental

security income ("SSI") under Title II and Title XVI of the Social Security Act (the "Act"), 42

U.S.C. §§ 401-433, 1381-1383f. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

Presently pending before the Court are cross-motions for summary judgment filed by

Kelley and the Commissioner. (D.I. 16, 20) Kelley asks the Court to reverse and remand

Defendant's decision. (D.I. 17) Defendant requests that the Court affirm his decision. (D.I. 21)

For the reasons set forth below, the Court will deny Kelley's motion for summary judgment and

grant the Commissioner's motion.

## II.   BACKGROUND

### A.   Procedural History

Kelley filed his application for DIB and SSI on January 16, 2007, alleging disability since

March 1, 2006, due to major depression, anxiety, panic attacks, poor concentration, headaches,

and cervical disc disease that caused head and neck pain. (D.I. 12 ("Transcript" and hereinafter

"Tr.") at 56, 145, 166) Kelley's application was denied initially on August 31, 2007, and was

again denied after reconsideration on December 7, 2007. (Tr. 55-58) Thereafter, Kelley

requested a hearing before an administrative law judge (hereinafter "ALJ"). (Tr. 76) A hearing

was held on February 25, 2009. (Tr. 23, 25) The ALJ issued a decision dated June 24, 2009,

concluding that Kelley was not disabled and denying benefits. (Tr. 5-22) Kelley timely

1

requested review of the ALJ's decision by the Appeals Council, which denied the request without substantive explanation on February 19, 2010. (Tr. 3-4, 52-54) Thus, the June 24, 2009 decision of the ALJ became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.955, 404.981; *Sims v. Apfel*, 530 U.S. 103, 107 (2000).

On April 21, 2010, Kelley filed a complaint seeking judicial review of the ALJ's June 24, 2009 decision. (D.I. 2) On March 7, 2011, Kelley moved for summary judgment and filed an opening brief in support. (D.I. 16, 17) In response, the Commissioner filed a cross-motion for summary judgment, and a combined opening and answering brief in support of his cross-motion and opposition to Kelley's motion. (D.I. 20, 21) Kelley then filed a reply brief. (D.I. 23)

## B. Factual Background

### 1. Kelley's Medical History, Treatment, and Condition

Kelley was fifty-one years old when he applied for DIB and SSI and, thus, is viewed for present purposes as closely approaching advanced age. *See* 20 C.F.R. §§ 404.1563, 416.963; Tr. 56. Kelley has a high school education and past relevant work experience as a manager of retail stores and as a fast food cook. (Tr. 20) In his applications for DIB and SSI, Kelley relied on several causes for his disability, addressed in detail below.

#### a. Cervical Degenerative Disk Disease and Headaches

Kelley sought medical treatment for head and neck pain complaints in June 2005, when he was referred by Dr. John Asman, M.D., to Dr. Paul C. Peet, M.D., a neurologist. (Tr. 221) Kelley's general and neurologic exam revealed no evidence of deficit, with exception of a significant paravertebral muscle spasm. (Tr. 222) Dr. Peet ordered cervical spine x-rays, which showed multilevel degenerative disk disease at C3-4, C4-5, C5-6, and C6-7, as well as a

2

prominent anterior osteophyte at C5-6. (Tr. 226) The x-ray results were compared to a prior

study dated November 22, 2004, and no significant changes were found. (Tr. 226) On July 5,

2005, Dr. Peet noted that Kelley continued having headaches and neck pain and prescribed

physical therapy. (Tr. 220) Kelley attended five physical therapy sessions from August 8, 2005,

to August 18, 2005. He was then discharged upon expiration of prescription with no additional

physical therapy recommended. (Tr. 204-05)

On August 31, 2005, Dr. Peet referred Kelley to Dr. Mohammed Mehdi, M.D., a pain

management specialist. (Tr. 219) Dr. Mehdi diagnosed bilateral occipital neuralgia causing head

and neck pains and ordered an MRI. (Tr. 240-41) The MRI showed a C6-7 disc protrusion and

degenerative changes in the lower lumbar spine. (Tr. 240-41) Dr. Mehdi prescribed various

medications to alleviate the pain symptoms and also, on November 22, 2005, performed a

cervical epidural steroid injection. (Tr. 242) After the injection, Kelley had three follow-up

visits – in December 2005 and then January and March 2006 – during which Dr. Mehdi

prescribed pain medication, including Elavil, Voltaren, and Fiorinal. (Tr. 229-34) There are no

records of visits between March 2006 and February 2007. On February 2, 2007, Dr. Mehdi noted

that Kelley could not continue with him after being laid off from work, and that Kelley was not

working but was applying for disability. Dr. Mehdi also recommended a consultation with a

surgeon. (Tr. 227-28)

Kelley saw Dr. Ronald C. Sabbagh, M.D., an orthopedic surgeon, on February 15, 2007.

(Tr. 244) On March 1, 2007, Dr. Sabbagh reviewed new MRI results, noting that the MRI of the

head was essentially normal and the MRI of the neck demonstrated some age appropriate

degenerative changes. (Tr. 243) Dr. Sabbagh further stated that he was uncertain what was

3

causing Kelley's headaches, that the disc and osteophyte complexes normally would cause radicular pain down the arm (which was not among Kelley's complaints), and that Kelley's neck condition did not require any surgical options. (Tr. 243) Dr. Sabbagh, who did not schedule a follow-up, referred Kelley to a neurologist. (Tr. 243)

On April 26, 2007, Kelley saw neurologist Dr. Stephen F. Penny, M.D., who diagnosed severe headaches and obstructive sleep apnea. (Tr. 252) Dr. Penny confirmed that previous diagnostic tests did not suggest a structural cause of the cough-induced headaches, and suggested that migraine was the most likely diagnosis. (Tr. 253) His examination showed that Kelley maintained normal strength in upper and lower extremities as well as normal coordination, sensation, and reflexes. (Tr. 253) Dr. Penny recommended Topamax for preventative therapy, a right occipital nerve block – which was performed the following day – and a sleep study. (Tr. 253-55) The first overnight polysomnogram, conducted on June 12, 2007, showed a moderate sleep disorder and moderate to severe snoring. (Tr. 302) On July 18, 2007, the second sleep study showed that sleep apnea was controlled with a nasal continuous positive airway pressure device and sleep efficiency was improved. (Tr. 319) On July 26, 2007, Dr. Penny again noted that clinical characteristics of the headaches were consistent with migraines. (Tr. 320) Kelley continued to see Dr. Penny, who again opined that pain characteristics were typical of migraine and that there were no findings on examination to suggest a cervical radiculopathy. (Tr. 324) Dr. Penny then referred Kelley to Dr. Ronald M. Lieberman, D.O., for pain management evaluation. (Tr. 324)

On October 4, 2007, Dr. Lieberman saw Kelley and diagnosed him with chronic cervicogenic headaches and could not rule out an underlying ligamentous laxity disorder. (Tr.

4

326-28) Dr. Lieberman recommended several types of nerve blocks, which were performed between October 2007 and January 2008. (Tr. 362-66) Kelley's response to all of the blocks was nondiagnostic. (Tr. 362-63) On January 30 and February 6, 2008, Dr. Lieberman stated that he was unable to explain Kelley's headaches objectively; he also reported a detailed conversation with Dr. Penny, who had worked up all medical possibilities for Kelley's etiology. (Tr. 361-62)

On April 28, 2008, Kelley was evaluated at Coastal Pain Care Physicians[1] for constant head and neck pain rated as four on a ten-point scale. A cervical MRI was ordered. (Tr. 444-46) The MRI findings did not change significantly compared to previous examination: Kelley had a multilevel disk and facet disease with a left-sided nerve foraminal encroachment at C3-4, C5-6, and C6-7; the only observed change was a more pronounced left paracentral disk and osteophyte complex contacting the ventral surface of the cord but not causing a significant cord deformity at C6-7. (Tr. 371) On May 19, 2008, a physician noted that prescription medications were working without side effects and recommended increased dosage of Soma, a muscle relaxant, and therapeutic massage. (Tr. 443) Kelley returned for follow-up visits through February 2009, and over that time his medication plan was adjusted with Avinza, morphine, being added in December 2008 due to continued complaints about pain. (Tr. 433-42) Kelley initially reported improvement after adding Avinza, but in February 2009 he complained that it only lasted fourteen hours, after which the prescribed dosage was increased. (Tr. 428-32)

---

[1]Kelley states that he was evaluated by Dr. Gabriel J. Somori, M.D. (D.I. 17 at 6), but there is only one progress note on his letterhead, and it is hard to determine from the rest of the treatment notes whether it was Dr. Somori who saw Kelley on other occasions (*see* Tr. 428-47).

### b. Depression

Kelley started treatment for his depression in early 2007 with Gwyn A. Stup, APRN, and

Dr. Diane S. Cohen, LCSW, of F.H. Everett & Associates. (Tr. 256-59, 265-71) On February

16, 2007, Ms. Stup assessed a depressed and anxious mood and affect, while the remainder of

Kelley's mental status examination was normal. (Tr. 257-58) Kelley was cooperative and

friendly, with relevant and normal speech, a normal range, and good judgment and insight. (Tr.

257-58) Ms. Stup diagnosed Kelley with a moderate recurring depression, and noted that Kelley

was dealing with grief from losing his parents and the loss of his job. (Tr. 256, 259) She gave

him a global assessment of functioning ("GAF") score of 60.[2] (Tr. 259) In May 2007, Ms. Stup

noted increased mood swings, crying spells and stress. (Tr. 260)

Kelley continued seeing Ms. Stup through February 2009. She noted ongoing symptoms

of attention deficits, mood swings, depression, frustration, anger, panic attacks, and anxiety with

slight improvement. (Tr. 331-39, 342-47, 388-402) Other aspects of the mental status

examinations were generally normal (Kelley was alert, oriented, cooperative, with intact memory

and fluent speech); the GAF scores ranged from 41 to 60. (Tr. 331-39, 342-47, 388-402) On

---

[2]Global assessment of functioning is a numerical scale used by mental health
professionals to subjectively evaluate the social, occupational, and psychological functioning of
adults. *See Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed. 2000). A
score of 41 to 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals,
frequent shoplifting) or any serious impairment in social or occupational functioning (e.g., few
friends, unable to keep a job). *See id.* at 34. A score of 51 to 60 indicates moderate symptoms,
such as flat affect and circumstantial speech, occasional panic attacks or moderate difficulty in
social or occupational functioning, including few friends and conflicts with peers or co-workers.
*See id.* A score of 61 to 70 indicates some mild symptoms, such as depressed mood and mild
insomnia, or some difficulty in social or occupational functioning, such as occasional truancy,
but generally functioning pretty well and having some meaningful interpersonal relationships.
*See id.*

October 31, 2007, Ms. Stup opined that Kelley was improving (with increased medication), including by having fewer panic attacks. (Tr. 332)

Kelley reported difficulty getting along with his family in January 2008, as well as problems keeping appointments with friends and stress at work in September 2008. (Tr. 388, 397) On December 3, 2008, Ms. Stup noted that Kelley reported improvement after medication dosage increase. Even though Kelley still had "some bad days," he indicated that he got better at dealing with them. (Tr. 427) After a mental status exam in February 2009, Ms. Stup noted an anxious manner, hyperactivity, depressed and anxious affect, obsessions and compulsions, and fair common sense, impulse control, and judgment. Kelley's GAF score was 55-60. (Tr. 423-25)

### 2. Medical Source Opinions

#### a. Physical Impairments

On August 4, 2007, Kelley underwent a physical residual capacity assessment by Dr. Robert Palandjian, a state agency medical consultant. (Tr. 272-78) Dr. Palandjian noted that Kelley could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for six hours in an eight hour workday, sit for a total of six hours, frequently climb a ramp or stairs but never climb ladders, ropes, or scaffolds, and occasionally balance, stoop, kneel, crouch, and crawl. (Tr. 273-74) Dr. Palandjian noted that reaching in all directions was limited to occasional, but not frequent or continuous, because of the cervical disk disease. (Tr. 274) No visual or communicative limitations were established. (Tr. 274-75) Dr. Palandjian limited exposure to environmental factors that could exacerbate migraines, such as extreme cold and heat, noise, vibrations, and fumes, odors, dusts, or gases. (Tr. 275) He also limited exposure to hazards because of the prescribed medications. (Tr. 275) Dr. Palandjian noted Kelley's partial

credibility, and indicated that the magnitude of Kelley's allegations was disproportionate to the medical evidence in the record and reported activities of daily living. (Tr. 278) Dr. Palandjian concluded that Kelley was capable of light activity with overhead and hazard restrictions. (Tr. 278) On December 6, 2007, Dr. Palandjian's assessment was affirmed by Dr. J. Acuna, a state agency medical consultant, since the new medical evidence did not significantly alter the limitations found on August 4, 2007. (Tr. 341)

On October 13, 2008, Dr. Somori filled out a cervical spine residual functional capacity questionnaire. (Tr. 404-08) Dr. Somori diagnosed degenerative cervical disk and facet disease and tension headaches. (Tr. 404) He noted severe cervical pain radiating around the forehead that increased with coughing, sneezing, and laughing, impaired sleep, chronic fatigue, muscle spasm, and decreased range of motion of the cervical spine. (Tr. 404) Dr. Somori also noted that Kelley had daily headaches, which lasted thirty minutes to many hours, but that the pain was controlled by medications which caused no side effects. (Tr. 405) Dr. Somori opined that Kelley could walk eight blocks without rest, sit thirty minutes and stand twenty minutes at one time, sit and stand or walk for two hours total in an eight hour workday, that he needed to switch positions at will, and need to take two unscheduled breaks a day. (Tr. 406-07) Dr. Somori also noted that Kelley could lift and carry ten pounds frequently, twenty pounds occasionally, and never fifty pounds; could rarely look up, could occasionally look down, and could turn his head right or left, and could frequently hold his head in static position. (Tr. 407) Dr. Somori further opined that Kelley could occasionally twist, stoop, crouch or squat, and climb stairs and ladders, and that Kelley could reach in all directions, including overhead, 10% of an eight hour workday. (Tr. 408) Dr. Somori concluded that Kelley's impairments were likely to produce good and bad days,

8

that Kelley was likely to be absent more than four days per month, and that he needed a low stress job. (Tr. 406, 408)

## b. Mental Impairments

On August 26, 2007, Dr. Joseph Keyes, Ph.D., conducted a clinical psychological evaluation and a memory functioning assessment. (Tr. 279-84) Dr. Keyes noted an overall appropriate appearance and behavior and a level of motor activity within normal limits. (Tr. 280) Dr. Keyes noted orientation and mental alertness within normal limits, affect appropriate to situation, adequate social and interpersonal skills, adequate interest and motivation, and independence in self-care skills. (Tr. 281-82) Memory functioning was adequate and within normal limits, with no memory impairments or disorders noted. (Tr. 281) Dr. Keyes concluded that Kelley had a mild major depressive disorder and a panic disorder with agoraphobia. (Tr. 282) Dr. Keyes gave Kelley a GAF score of 60-65. (Tr. 282)

On August 29, 2007, Dr. Christopher King, Ph.D., conducted a psychiatric review of the record and concluded that Kelley had mild depression, anxiety, and a history of marijuana abuse, all of which were not severe. (Tr. 285) Dr. King concluded that there were no restrictions of activities of daily living, no difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation of extended duration. (Tr. 293) He also noted that Kelley had mild difficulties in maintaining social functioning. (Tr. 293) On December 5, 2007, Dr. King's findings were affirmed by Dr. Pedro M. Ferreira, Ph.D. (Tr. 340)

On January 16, 2008, Ms. Stup completed a medical certification form, diagnosed Kelley with a major depressive disorder, and opined that he was unable to work. (Tr. 347) On July 22, 2008, Ms. Stup filled out a mental impairment questionnaire. (Tr. 410-15) She noted that Kelley

9

had difficulty responding to his medication for depression with mood changes, horrible bouts of anger, and social difficulties interacting with others. (Tr. 410) Ms. Stup opined that Kelley could not tolerate mental stress, and that he got easily angered and frustrated because of his inability to pay attention and follow instructions. (Tr. 412-13) She also noted that Kelley was unable to maintain attention in a two-hour segment, unable to complete a normal workday and workweek without interruptions from psychologically based symptoms, and unable to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 412) Ms. Stup concluded that Kelley's impairments would cause him to miss more than four days of work per month. (Tr. 415)

### 3. The Administrative Hearing

Kelley's administrative hearing took place on February 25, 2009. (Tr. 23-51) Kelley was represented by counsel and testified at the hearing. In addition, a vocational expert testified.

#### a. Plaintiff's Testimony

At the hearing Kelley testified that he was born on November 24, 1955, had a high school education, and had some previous work experience as a manager and a cook. (Tr. 29-30) He had been unemployed since 2006, when he had lost his job at a liquor store because of the business's financial difficulties. (Tr. 30) After being fired, Kelley looked for another job, but at that time his neck and head condition deteriorated. He also had to take care of his ill father, who required twenty-four hour care. (Tr. 31) At the time of the hearing, Kelley collected welfare assistance and food stamps and also received help from his brother, with whom he lived. (Tr. 36-37) Kelley also helped at a local antique shop up to fifteen hours a week in return for being allowed to use the space to sell some of his things, from which he received less than 1,000 dollars a

10

month. (Tr. 42-43) Kelley testified that he was unable to work a full-time job because he could not guarantee working a full forty hour week due to unpredictability of his good days turning into bad days. (Tr. 44)

Kelley testified that his neck and head pain increased after his father's death; by the time of the hearing he was suffering from severe headaches that lasted from twenty minutes to an hour. (Tr. 31, 38) Initially, the headaches were triggered by coughing or sneezing, but by the time of the hearing laughing, crying, bending the wrong way, or reaching under a table could set off the pain. (Tr. 38-39) To cope with the incidents of extreme pain, Kelley took Dilaudid and laid down until the pain would go away. (Tr. 39) He was also taking Avinza, slow release morphine, on a daily basis, the dosage of which was continually increased. (Tr. 39) Kelley testified that he experienced only occasional grogginess from his medications, if he failed to eat properly. (Tr. 40) Kelley explained that his severe pain affected his ability to walk and stand because it was making him dizzy and nauseous. (Tr. 42) He also testified that he could not lift anything extremely heavy because it could aggravate his neck pain. (Tr. 41)

Kelley explained that he first sought mental health help after the death of his parents. (Tr. 32) He testified that his depression changed his personality and that he did not enjoy going out or going to his friends' homes as he used to. (Tr. 40) His doctors were also trying to figure out whether he had attention deficit disorder by giving him some medicine to see whether it would improve his condition. (Tr. 41) Kelley explained that he was seeing Ms. Stup on a monthly basis for medical check-ups and Dr. Somori monthly for adjusting his pain medications. (Tr. 41)

Kelley also testified about activities of daily living. He explained that he used to enjoy gardening, fishing, and antiquing, but could not continue because of his medical conditions. (Tr.

11

34-35) Kelley was the sibling responsible for closing his parents' house after his father's death, following which Kelley moved in with his brother, where he helped with the chores on good days. (Tr. 33, 37) On a usual day, Kelley went to help his friend who owned an antique shop or watched TV at home or did basic house chores, like laundry. (Tr. 42) He also testified that his conditions did not affect his ability to take care of himself: he could get dressed, shower, and do other things without assistance. (Tr. 44)

### b. Vocational Expert's Testimony

Following Kelley's testimony, the ALJ heard the testimony of a vocational expert, Gary Young. (Tr. 45) Mr. Young characterized Kelley's past job as a manager of a retail store as skilled and light, but very heavy as it was performed. (Tr. 45) Kelley's prior job as a fast food cook was skilled and at medium exertional level. (Tr. 45) Mr. Young further explained that there were not enough transferrable skills to sedentary work to make a full-time job. (Tr. 45-46) He also explained that pain and depression could affect the ability to work: the more severe the symptoms, the less likely a claimant could work. (Tr. 46)

The ALJ then asked the expert to consider a hypothetical person who was fifty-five years old and closely approaching advanced age, with a high school education and prior work history similar to Kelley's, and with all the symptoms and limits that Kelley testified to at the hearing. (Tr. 47) When the ALJ asked whether the hypothetical person would be capable of performing any jobs, the expert responded in the negative. (Tr. 47) The ALJ then changed the hypothetical to a similar person who was capable of working at a light level of exertion, despite the allegations of subjective symptoms. (Tr. 47) He further limited the second hypothetical question to simple routine jobs that would give an opportunity to occasionally change positions to relieve

12

discomfort and would not involve any overhead tasks. (Tr. 47) The expert testified that none of the past work could be performed, but that the hypothetical person could perform the following jobs: (1) office helper, with 12,000 jobs locally and 197,000 nationally; (2) cashier, with 100,000 jobs locally, and 1.5 million nationally; and (3) inspector, with 2,000 jobs locally and 300,000 nationally. (Tr. 47-48)

Kelley's representative asked Mr. Young to determine whether the hypothetical claimant with all of the restrictions outlined in Dr. Somori's questionnaire could perform any of the jobs the expert cited as examples. (Tr. 48) Mr. Young testified that full-time work would be precluded because of the four or more days per month of absences, although the lifting and postural limitations would not make a difference. (Tr. 49) Kelley's representative also asked about Dr. Somori's opinion that Kelley's symptoms would be severe enough to frequently interfere with attention and concentration needed to perform even simple work tasks. (Tr. 49) The vocational expert responded that this, too, would preclude work. (Tr. 49)

### 3. The ALJ's Findings

On June 24, 2009, the ALJ issued the following findings:[3]

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2. The claimant has not engaged in substantial gainful activity since March 1, 2006, the alleged onset date (20 C.F.R. 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: head pain, degenerative disk disease in the cervical spine, depression, and anxiety (20 C.F.R. 404.1520(c) and 416.920(c)).

---

[3]The ALJ's factual findings have been extracted from his decision, which interspersed factual findings and commentary. (Tr. 8-22)

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1525, 404.1526, 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), except that claimant is limited to performing tasks that are simple and routine in nature, that he must be allowed the opportunity to occasionally change positions to relieve his discomfort and that he cannot perform overhead tasks.

6. The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565 and 416.965).

7. The claimant was born on November 24, 1955, and was fifty years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 C.F.R. 404.1563 and 416.964).

8. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not claimant has transferable job skills. *See* SSR 82-41; 20 C.F.R. Part 404, Subpart P, Appendix 2.

10. Considering claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a "disability," as defined in the Social Security Act, from March 1, 2006 through the date of this decision (20 C.F.R. 404.1520(g) and 416.920(g)).

(Tr. 8-22)

14

## III. LEGAL STANDARDS

### A. Motion for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining the appropriateness of summary judgment, the Court must "review the record taken as a whole . . . draw[ing] all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (internal quotation marks omitted). If the Court is able to determine that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law, summary judgment is appropriate. *See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005).

### B. Review of the ALJ's Findings

The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a de novo review of the Commissioner's decision and may not re-weigh

the evidence of record. *See Monsour*, 806 F.2d at 1190. The Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). However, evidence that was not submitted to the ALJ can be considered by the Appeals Council or the District Court as a basis for remanding the matter to the Commissioner for further proceedings, pursuant to the sixth sentence of 42 U.S.C. § 405(g). *See Matthews*, 239 F.3d at 592. "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 657 (D. Del. 2008) (internal quotation marks omitted).

The Third Circuit has explained that a "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g. that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

Thus, the inquiry is not whether the Court would have made the same determination but, rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Even if the reviewing Court would have decided the case differently, it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. *See Monsour*, 806 F.2d at 1190-91.

## IV.    DISCUSSION

### A.    Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). Title XVI of the Social Security Act provides for the payment of disability benefits to indigent persons under the SSI program. 42 U.S.C. § 1382(a). A "disability" is defined for purposes of both DIB and SSI as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (mandating

17

finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe), 416.920(a)(4)(ii). If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

At step four, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC") to perform his past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Halter*, 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer*, 186 F.3d at 428.

If the claimant is unable to return to his past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating finding of

18

non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last

step, the burden is on the Commissioner to show that the claimant is capable of performing other

available work before denying disability benefits. *See Plummer*, 186 F.3d at 428. In other

words, the Commissioner must prove that "there are other jobs existing in significant numbers in

the national economy which the claimant can perform, consistent with her medical impairments,

age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ

must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the

ALJ often seeks the assistance of a vocational expert. *See id.*

### B.      Kelley's Argument on Appeal

Kelley presents four arguments in his appeal: (1) the ALJ ignored portions of the opinion

of the state agency non-examining physician and failed to provide grounds for rejecting this

evidence; (2) the ALJ failed to accord adequate weight to the opinion and assessments of

Kelley's treating physician; (3) the ALJ failed to accord appropriate deference to the opinions of

Kelley's treating nurse practitioner; and (4) the Commissioner did not meet his burden of

establishing that there was other work in the national economy that Kelley could perform. The

Court considers each of these arguments in turn.

### 1.      Whether the ALJ ignored portions of a non-examining physician's opinion without providing grounds for rejection

Kelley argues that the ALJ failed to consider additional restrictions in Dr. Palandjian's

assessment, such as limited ability to reach, stoop, and kneel, as well as environmental

limitations, while at the same time relying on other parts of Dr. Palandjian's opinion. (D.I. 17 at

11-12) Kelley further argues that the ALJ failed to provide a rationale for the rejection of

additional restrictions. (D.I. 17 at 12) The Commissioner responds that the ALJ intended to adopt Dr. Palandjian's opinion only to the extent that it was consistent with Kelley's RFC. (D.I. 21 at 16)

An ALJ is responsible for reviewing the evidence and making findings of fact and conclusions of law, including by considering opinions of State agency medical or psychological consultants. *See* 20 C.F.R. § 404.1527(f)(2). The ALJ must treat the opinions of State agency medical consultants as expert opinion evidence; such opinions cannot be ignored, and the weight given to them must be explained in the opinion. *See* SSR 96-6p. The ALJ must consider, discuss, and weigh all relevant medical evidence and explain his reasoning for giving some opinions more weight or rejecting them. *See Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). All the impairments credibly established in the record must then be included in the hypothetical question posed to the vocational expert. *See Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004). At the same time, the ALJ has the responsibility to formulate the RFC, *see* 20 C.F.R. §§ 404.1546(c), 416.946(c), which is an administrative finding and not a medical opinion, *see* SSR 96-5p. Even though the RFC assessment may adopt one or more physicians' opinions, the two are not the same thing: "an RFC assessment is the [ALJ's] ultimate finding" based on consideration of all the evidence in the record "about what an individual can do despite his or her impairment(s)." *Id.*

In Kelley's case, the ALJ expressly considered Dr. Palandjian's opinion in making the RFC finding and agreed with the doctor's findings "to the extent that they [were] consistent" with the ALJ's findings, specifically with the determination that Kelley had the ability to work in spite of his physical impairments. (Tr. 17) The ALJ did not adopt Dr. Palandjian's opinion in

20

full; to the contrary, the ALJ found that Kelley was "limited to the extent noted in the [RFC] . . .

consistent with the evidence of record." (Tr. 17) Dr. Palandjian concluded that Kelley "should

be capable of light activity with overhead/hazard restrictions" (Tr. 278), and it is this conclusion

on which the ALJ relied in formulating the RFC (Tr. 17). The ALJ further limited the RFC to

jobs that allow for occasional changes in position to relieve discomfort, a limitation that was not

a part of Dr. Palandjian's assessment. (Tr. 13, 278)

Kelley now argues that the ALJ failed to consider the limitations that Dr. Palandjian

imposed on reaching, but the Court finds that Kelley misinterprets the assessment. Dr.

Palandjian checked the box for limited reaching in all directions, including overhead, due to the

cervical disk disease, and then made a reference to section IV for additional comments. (Tr. 274)

In the narrative form, Dr. Palandjian noted only overhead and hazard restrictions (Tr. 278), which

leads to the conclusion that not all types of reaching were restricted. Moreover, inability to

reach, stoop, or kneel was not among Kelley's subjective complaints during the disability

hearing. (Tr. 29-44) The hazard restrictions were included because of the potential side effects

of the medications used to treat Kelley's symptoms (Tr. 275); however, the ALJ relied on the

medical evidence consistent with Kelley's testimony that he did not experience side effects

unless he did not eat (Tr. 16, 17), and did not include additional restrictions in the RFC.

The Court concludes that the ALJ complied with his obligation to review and analyze the

medical evidence of record by considering Dr. Palandjian's opinion and according it the weight

the ALJ found to be appropriate. The Court further concludes that the ALJ did not err in

accepting Dr. Palandjian's opinion in part and that he adequately articulated his reasoning for

doing so.

21

## 2. Whether the ALJ failed to accord adequate weight to the opinion of Kelley's treating physician

Kelley also argues that the ALJ failed to give controlling weight to the opinion of a treating physician, Dr. Somori, an opinion Kelley contends is consistent with the objective findings and other medical evidence in the record. (D.I. 17 at 18) The Commissioner responds that the ALJ had sufficient grounds to find Dr. Somori's opinion inconsistent with the medical evidence and Kelley's daily activity level and, therefore, had a sufficient basis to accord it minimal weight. (D.I. 21 at 17-18)

A treating physician's opinion is entitled to controlling weight when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and consistent with the other substantial evidence of the record. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Even though a treating physician can render an expert opinion based on continued observation of his patient's condition over an extended period of time, *see Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000), such an opinion should be supported by objective medical evidence, *see* 20 C.F.R. §§ 404.1529(a), 416. 929(a); *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991). Objective evidence includes medical signs and laboratory findings. *See* 20 C.F.R. §§ 404.1529(a), 416.929(a). A simple recitation of a patient's subjective complaints in a report or treatment notes does not transform subjective complaints into objective medical findings nor entitle such complaints to controlling weight. *See Hatton v. Comm'r of Soc. Sec. Admin.*, 131 Fed. Appx. 877, 879 (3d Cir. 2005).

The ALJ discussed the treatment notes from Coastal Pain Care Physicians and the opinion rendered by Dr. Somori and afforded the latter minimal weight because the limitations

contained therein were inconsistent with the medical evidence of record and Kelley's daily activity level. (Tr. 16-17) Kelley argues that Dr. Somori's opinion is supported by objective medical evidence, such as MRIs of the neck performed in 2005, 2007, and 2008, which the ALJ allegedly disregarded. (D.I. 17 at 17) The ALJ, however, discussed the findings of the MRIs in his opinion, including by noting that the findings of the latest test performed in 2008 "had not changed significantly from previous examinations." (Tr. 15) The ALJ further discussed the detailed medical history comprising observations and examinations by various doctors who failed to establish a connection between the headaches and the degenerative processes in the cervical spine. (Tr. 15-16) Kelley's subsequent treatment at Coastal Pain Care Physicians primarily involved adjustments in his prescription pain medications plan. (Tr. 15-16)

The treatment notes from Coastal Pain Care Physicians are one page long for each visit, restate Kelley's subjective complaints, indicate that Kelley was alert, oriented, and without focal deficit, and go on to adjust the treatment plan. (Tr. 428, 431-43) A simple restatement of Kelley's subjective complaints about pain and stiffness does not transform those complaints into objective medical evidence that could provide support for Dr. Somori's opinion about all the additional limitations. The ALJ was justified in allocating minimal weight to an opinion that was largely based on Kelley's subjective complaints and a single MRI, the results of which did not differ significantly from prior examinations. Moreover, the Cervical Spine Residual Capacity Questionnaire is a standard "check a box" or "fill in a blank" form with minimal commentary and no supporting attachments. (Tr. 404-08) Such a form is "weak evidence at best," with suspect reliability when unaccompanied by thorough written report. *See Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993). Even though Dr. Somori was a treating physician, his opinion

was not entitled to controlling weight in the absence of supporting objective medical findings.

Thus, the Court finds that the ALJ's findings of fact and conclusions of law with respect to Dr. Somori's opinion are supported by substantial evidence.

### 3.  Whether the ALJ failed to account adequately for the treating nurse practitioner's opinion

Kelley further argues that the ALJ failed to provide adequate reasoning for rejecting Ms. Stup's opinion and that the ALJ ignored portions of her treatment notes. (D.I. 17 at 21)  The Commissioner responds that the ALJ reviewed Ms. Stup's opinion and treatment notes and properly concluded that they were inconsistent with other medical evidence on the record. (D.I. 21 at 19)

In evaluating an impairment, an ALJ may consider evidence from a source such as a nurse practitioner, but such evidence is not entitled to controlling weight. *See* 20 C.F.R. §§ 404.1513(d), 416.913(d).  The ALJ must consider evidence from a nurse practitioner in the context of the entire administrative record and may accord it little weight. *See Rios v. Barnhart*, 57 Fed. Appx. 99, 101 n.2 (3d Cir. 2003).

Contrary to Kelley's contentions, the ALJ discussed Kelley's history of mental health problems in great detail.  First, the ALJ noted that Kelley's mental status examinations routinely reported depressed and anxious moods, while also describing him as alert, oriented, with intact recent and remote memory and fluent speech, and cooperative.  (Tr. 16)  The ALJ also reviewed the treatment notes that included occasional findings of preoccupation and obsessive thought and only fair judgment at times.  (Tr. 16)  The treatment notes also referred to unresolved grief over the deaths of Kelley's parents and show that Kelley reported being told that he was addicted to

24

his pain medications. (Tr. 16) The ALJ then considered all the GAF scores assigned to Kelley from January 2007 to February 2009. (Tr. 16-17) The ALJ concluded that the GAF scores assigned by Ms. Stup were inconsistent with Kelley's level of functioning and the treatment notes. (Tr. 18) For example, Ms. Stup listed a 41-50 GAF score on July 14, 2008, and then listed a 65 GAF score in a mental impairment questionnaire on July 22, 2008. (Tr. 18)

The ALJ specifically addressed the mental impairment questionnaire completed by Ms. Stup in July 2008. (Tr. 18) He concluded that she was not an acceptable medical source and gave little credibility to her opinion. (Tr. 18) The ALJ reasoned that the statements made on the questionnaire were not supported by the evidence of the record and were based on Kelley's subjective complaints instead of mental status examinations findings and observations. (Tr. 18) Overall, the limitations reported by Ms. Stup were inconsistent with the treatment notes from health providers and with Kelley's level of daily functioning. (Tr. 19)

After a careful consideration of the entire medical record, including Ms. Stup's treatment notes, F.H. Everett & Associates' progress notes, and reports by the agency consulting physicians, the ALJ concluded that Ms. Stup's opinion was inconsistent with the other evidence and, therefore, assigned it little weight. (Tr. 19) The Court finds that the ALJ provided detailed reasoning for his conclusion, which is supported by substantial medical evidence in the record, and, thus, finds Kelley's third argument unavailing.

### 4. Whether the Commissioner failed to meet his burden of establishing availability of alternative work in the national economy that Kelley can perform

Lastly, Kelley argues that the ALJ's reliance on the vocational expert's testimony was misplaced because the hypothetical question was deficient and did not comprehensively describe

25

Kelley's limitations, which were contained in Dr. Palandjian's, Dr. Somori's, and Ms. Stup's opinions. (D.I. 17 at 22-23)  The Commissioner responds that the ALJ properly included all the limitations that were medically established and supported by the record. Therefore, the ALJ could properly rely on the expert's testimony to establish that jobs Kelley could perform existed in significant numbers in the national economy. (D.I. 21 at 20)

In order to meet the burden of production at step five of the sequential analysis, the Commissioner needs to identify at least one occupation that exists in significant numbers in the national economy that a claimant can perform. *See Craigie v. Bowen*, 835 F.2d 56, 58 (3d Cir. 1987). A vocational expert's answer to a hypothetical question can be considered substantial evidence only when the question reflects all of a claimant's impairments that are supported by the record. *See Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987). However, the ALJ need not include any impairments and limitations that are not "medically established" by the record. *See Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005).

In Kelley's case, the ALJ limited the hypothetical claimant to performing light work, except that the tasks had to be simple and routine in nature, that claimant had to be allowed the opportunity to occasionally change positions to relieve his discomfort, and that he could not perform overhead tasks. (Tr. 47)  Based on these limitations, the vocational expert testified that there were at least three occupations that such a hypothetical claimant could perform. (Tr. 47-48) As the Court explained above, the limitations that the ALJ included in his assessment of RFC and in the hypothetical question are supported by substantial evidence in the administrative record. The ALJ did not err in partially adopting Dr. Palandjian's opinion and assigning little weight to Dr. Somori's and Ms. Stup's reports; therefore, he was not required to include any

additional limitations in the hypothetical question (as they were not credibly established by the record). Because the hypothetical question was not improperly formulated, the Court finds that the vocational expert's testimony is substantial evidence of Kelley's ability to work, and, therefore, the Commissioner met his burden of production at step five of the analysis.

## V.    CONCLUSION

For the forgoing reasons, the ALJ's decision is supported by substantial evidence. Kelley's motion for summary judgment will be denied and the Commissioner's motion for summary judgment will be granted.  An appropriate Order will be entered.

27